1  JOSEPH WAHL (SBN 281920)
    joseph.wahl@btlaw.com
2  SHANT N. NASHALIAN (SBN 322549)
    shant.nashalian@btlaw.com
3  **BARNES & THORNBURG LLP**
   2029 Century Park East, Suite 300
4  Los Angeles, California 90067-2904
   Telephone:  (310) 284-3880
5  Facsimile:   (310) 284-3894

6
7  Attorneys for Plaintiff CONVERGENT MEDIA IV LLC

8
9                    UNITED STATES DISTRICT COURT
10                  CENTRAL DISTRICT OF CALIFORNIA
11                          WESTERN DIVISION

| | |
|---|---|
| CONVERGENT MEDIA IV LLC, a Florida limited liability company, | Case No. 2:24-cv-00129 |
| Plaintiff, | **COMPLAINT** |
| v. | |
| APERTURE MEDIA PARTNERS LLC, a Delaware limited liability company, | |
| Defendant. | |

19                              **COMPLAINT**

20      Plaintiff, Convergent Media IV LLC ("Convergent") hereby sues Aperture

21  Media Partners LLC ("Aperture"), and alleges:

22  **I.    PARTIES, JURISDICTION, AND VENUE**

23      1.    Convergent is a Florida limited liability company, with its principal

24  place of business in Florida.

25      2.    Aperture is a Delaware limited liability company, with its principal

26  place of business in Los Angeles, California.

27      3.    Pursuant to Title 28 of the United States Code §1332(a)(1), and other

28  applicable law, this Court possesses jurisdiction over this case the Parties are diverse

in that they are citizens of different states and the amount in controversy exceeds $75,000.  The value of the object of the litigation exceeds $128,034 based upon Aperture's breaches, as more fully described below.

4. Pursuant to Title 28 of the United States Code §1391(a), venue is proper in the Central District of California because a substantial part of the events giving rise to the claims put forth herein occurred in the Central District of California and Aperture is located in the Central District.  Furthermore, pursuant to the agreement between lenders, Aperture consented to participate in any legal action with Convergent in the Central District of California.

## II. OVERVIEW OF CONTROVERSY UNDERLYING THIS ACTION

5. This Complaint pertains to a controversy as to the allocation of payments received by Aperture from MX2 Holdings, LLC (the "Borrower"), in connection with a movie entitled "Maggie Moore(s)" (the "Film").

6. Aperture is a media finance and production company that focuses on providing advisory services and entertainment financing for the production of films and television series.  Aperture advertises itself as a "one-stop shop," that provides not only capital, but also a variety of other entertainment services such as production, distribution, and advertisement.

7. Convergent is a special purpose entity formed to interface with Aperture to participate in lending money to the Borrower for the production of the Film.  The Borrower received financing from both Convergent and Aperture for the production of the Film.

8. The completion of the Film occurred with the assistance of Media Guarantors Insurance Solutions, LLC ("MGIS").  MGIS specializes in providing bonds to production companies to facilitate completion of the Films.

## III. THE LOAN AGREEMENT AND THE INTERCREDITOR AGREEMENT

9. On October 22, 2021, Aperture and the Borrower entered into a lending

relationship for the principal amount of $7,366,638 (the "Loan Amount"). The Loan Amount was to be used for the purpose of producing, completing, and delivering the Film. The lending relationship is evidenced by a series of loan documents, including the "Loan and Security Agreement" (the "Loan Agreement"), executed between the Borrower and Aperture on October 22, 2021.

10. The Loan Agreement includes a list of authorized distributors (collectively, the "Current Distributors"), based upon those distribution companies with current distribution contracts with the Borrower (collectively, the "Distribution Contracts"). The Current Distributors included both domestic and international distribution companies with distribution territories all over the world.

11. The Loan Agreement also stated that the Film was to be produced by both the Borrower and MX2 Productions Inc. ("MX2"). MX2 is a Florida corporation that is affiliated with the Borrower. Pursuant to the terms of the Loan Agreement, all production bank accounts that were maintained in connection with the Film were to be maintained under the name of either MX2 or the Borrower. MX2 was also responsible for acquiring certain copyrights necessary to obtain rights to the screenplay that served the basis for the Film.

12. The Loan Agreement makes reference to the roles of other third parties, including MGIS, in ensuring timely production and delivery of the Film to Aperture, in the event of exigencies. The Loan Agreement provided that Endeavor Content, LLC (the "Sales Agent") would be engaged as the sales agent for the Borrower and would be primarily responsible for the sales of the Film to the authorized distributors. The responsibilities of MGIS, the Sales Agent, the Borrower, and Aperture are more fully governed by the "Sales Agent Interparty Agreement."

13. Though Convergent is not a party to the Loan Agreement, the Loan Agreement contemplates that Convergent would provide funding for a portion of the Loan Amount. Accordingly, on October 22, 2021, Convergent and Aperture executed the "Agreement Between Lenders" (the "Intercreditor Agreement"). A

BARNES &
THORNBURG LLP
ATTORNEYS AT LAW
LOS ANGELES

41270873.1

3
COMPLAINT

true and correct copy the Intercreditor Agreement is attached hereto as Exhibit "1."

14. The Intercreditor Agreement states that $900,000 of the Loan Amount would be funded by Convergent (the "Convergent Loan Amount"), with the remaining $6,466,638 to be provided by Aperture (the "Aperture Loan Amount"). The Intercreditor Agreement provides that Aperture would be primarily interfacing with the Borrower and outlines the distribution of payments received towards the Loan Amount. As the senior lender under the Intercreditor Agreement, Aperture was first in line to be paid and upon full payment of the Aperture Loan Amount, Convergent would then begin to recoup the Convergent Loan Amount from the Borrower.

15. The Intercreditor Agreement requires that upon full and final payment of the Aperture Loan Amount, Aperture assign all rights, title, and interest held by Aperture in the Loan Agreement to Convergent.

IV. **APERTURE'S ALLEGATIONS OF BORROWER'S DEFAULTS UNDER THE LOAN AGREEMENT**

16. Following the execution of the Loan Agreement, the Borrower and MX2 began work on producing the Film. Shortly thereafter, Aperture claimed that the Borrower had defaulted under the terms of the Loan Agreement. In hindsight, Aperture's intentions and motivations are clear. From the outset, Aperture had no interest in a business relationship with Convergent as contemplated in the Intercreditor Agreement. Rather, Aperture's only goal was to purloin the credit enhancement provided by Convergent's subordinated investment by generating massive fees, interest, and superficial default interest applicable to the Aperture Loan Amount. Aperture sought to accomplish this goal by using trumped-up defaults of the Loan Agreement, thereby triggering the Loan Agreement's unlawful and unenforceable default interest provision, and racking up excessive and unnecessary legal fees chasing default interest, to which Aperture was not entitled. By continuously adding default interest and various fees to the balance of the Loan

Amount, Aperture sought to create a situation where the Aperture Loan Amount would never be paid off, thereby frustrating the purpose of the Intercreditor Agreement and preventing the automatic assignment of the right to service the loan to Convergent.

17. Aperture's spurious claims of default began on March 28, 2022, when Aperture sent an e-mail to the Borrower claiming that the Borrower had triggered a default event under the terms of the Loan Agreement. For example, Aperture claimed that the Borrower triggered a default event when the Film's distributor for the Russian territory (among others in the region) was an unacceptable distributor. By unilaterally determining this distributor was unacceptable, Aperture claimed that the gap amount was less than the maximum permitted gap amount, which Aperture claims had a material adverse effect on the Borrower. Yet, afterwards, when this purportedly "unacceptable distributor's" related entity located outside of Russia wired $320,000 to Aperture, Aperture accepted those funds. To the extent the gap amount exceeded the maximum permitted gap amount, Aperture's acceptance of $320,000 reduced the gap amount far below the maximum permitted gap amount. Even though Aperture has accepted this payment, and there has been no materially adverse effect on the Borrower, Aperture continues asserting that the Borrower is in default on this basis.

18. Another trumped-up default alleged by Aperture relates to the Film's delivery date. The Film was scheduled to be delivered to (a) the Sales Agent by August 21, 2022, (b) the Current Distributors by October 1, 2022, and (c) Aperture within sixty (60) days of the expiration of the "Letter of Credit Agreement." Pursuant to Section 1.1 of the Loan Agreement, MGIS had sole discretion to extend those deadlines based upon a notice of exigencies. MGIS extended these deadlines several times, ultimately extending the deadline for delivery to the Sales Agent to December 19, 2022, and the deadline for delivery to the Current Distributors was extended to January 29, 2023. The completion bond delivered the film prior to this

date.  Notwithstanding the Borrower's timely delivery of the Film, Aperture continues to assert that the Borrower failed to timely deliver the Film.  Furthermore, as the bond was successfully initiated by MGIS, and the Film was delivered pursuant to the bond, the bond functioned as required and per agreement, thereby avoiding any defaults related to, among other things, the budget or delivery of the Film.

19.     Perhaps the most brazen of Aperture's concocted defaults arises out of Aperture's allegation that the Borrower rejected an offer of $300,000 from a distributor to distribute the Film in Latin America in November of 2021.  Tellingly, *for the first time ever*, on or about October 24, 2023, one month after the Aperture Loan Amount was satisfied, Aperture alleged that Borrower actually triggered a default event on November 12, 2021, **a full two years earlier**.  This purported default occurred less than one month after Aperture and the Borrower executed the Loan Agreement, which was in an amount well-below the minimum value ascribed for sales of the Film to the Latin America territory.

20.     Despite clear language to the contrary, Aperture now contends that in addition to the Borrower's requirement to obtain written approval from Aperture prior to entering into any distribution agreements, the Borrower also was required to obtain written approval from Aperture prior to rejecting any offers.  First, *assuming arguendo* that Aperture's interpretation of the Loan Agreement is correct, no offer for distribution in the Latin America territory was ever conveyed to Borrower from Particular Crowd, LLC, the distributor in question.  Next, while some informal discussions regarding the Latin American territory did occur in November of 2021, Aperture was a full participant in those discussions and could have weighed in regarding Borrower's purported rejection of the offer at that time; however, Aperture agreed with Borrower that the amounts discussed at that point fell far below being worthy of any serious consideration.  Aperture only conveniently contends this purported rejection was a default event as a desperate cash-grab for

default interest.

21. The various other claimed defaults by the Borrower under the Loan Agreement similarly appear to be concocted and meritless events of default.

22. Aperture's improper actions are not limited to trumped-up allegations of default, but also to incurring $46,317 in unnecessary and excessive attorneys' fees, allegedly incurred in connection with the servicing of the Loan Agreement. On information and belief, the only work performed by Aperture's attorneys in connection with the Loan Agreement amounted to sending a handful of short letters alerting the Borrower to its purported defaults. Certainly, these activities do not warrant $46,317 in claimed legal fees. When Aperture presented Convergent with this fact, while noting that payments under the Loan Agreement were used to pay for those fees, and notwithstanding Convergent's request for details, Aperture refused to provide Convergent with any context of the fees beyond that they were related to Aperture's servicing of the Loan Amount.

## V. **APERTURE'S FRUSTRATION OF THE LOAN AGREEMENT TURNS INTO APERTURE BREACHING THE INTERCREDITOR AGREEMENT**

23. As the primary entity interfacing with the Borrower, Convergent relied upon Aperture to calculate, collect, and distribute all payments received by the Borrower in accordance with the terms of the Intercreditor Agreement. As outlined above, the Intercreditor Agreement provides that once Aperture was reimbursed for fees and costs and Aperture Loan Amount was paid in full, all payments would be utilized towards repayment to Convergent.

24. Aperture was paid in full no later than September 27, 2023. However, despite being paid in full, Aperture has breached the Intercreditor Agreement by not assigning the servicing of the Loan Agreement to Convergent. Aperture continues to assert rights under the Loan Agreement it no longer has. By not assigning the servicing of the Loan Agreement to Convergent, Aperture has received at least

$128,034 in payments that, per the Intercreditor Agreement, should have been paid to Convergent.

25. Aperture has also breached the Intercreditor Agreement by failing to recognize Convergent's initiation of the buy-out procedure under the Intercreditor Agreement. On October 17, 2023, Convergent sent Aperture a "Buy Out Notice", and requested Aperture to prepare a calculation and breakdown of the purchase price of the remainder of the Loan Amount pursuant to Section 12 of the Intercreditor Agreement. Yet, on October 24, 2023, Aperture responded to Convergent's Buy-Out Notice by not recognizing it, allowing Aperture to continue to attempt to make erroneous claims of defaults the Loan Agreement, purloin proceeds entitled to Convergent, and not releasing the Loan Agreement to be serviced by Convergent. Aperture defended its improper actions by erroneously claiming that the Buy-Out Notice may only be submitted if Aperture desired to assign its rights and interest to a third party. Further, Aperture claimed that this alone was a condition precedent that was required to occur before the Buy-Out Notice could be considered. Ultimately, Aperture failed to provide its buy out calculations within the period specified in the Intercreditor Agreement, breaching the same.

## FIRST CLAIM FOR RELIEF

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

26. Convergent reincorporates by reference the allegations contained in paragraphs 1 through 25 above as though fully set forth herein.

27. The Parties are parties to the Intercreditor Agreement and the Intercreditor Agreement is binding and enforceable.

28. Pursuant to the terms of the Intercreditor Agreement, all payments received from the Borrower were to be made either directly to Aperture or subsequently provided to Aperture. .

29. The Intercreditor Agreement further provided that, upon satisfaction of the Aperture Loan Amount, Aperture's rights, interest, and title under the Loan

Agreement would automatically transfer to Convergent, thereby allowing Convergent to step into the shoes of Aperture. Upon this automatic assignment to Convergent, Aperture is obligated to disgorge to Convergent all amounts received by Aperture after it had been paid in full.

30. As stated above, by concocting trumped-up defaults and paying its attorneys unnecessary and excessive fees, all adding to the balance of the Loan Amount, Aperture is effectively creating a scenario where (under its interpretation of the Loan Agreement) the balance of the Aperture Loan Amount will never be zero, and Aperture will continue to purloin for the sole benefit of Aperture while unnecessarily extending the date where Convergent will start to receive payments from Borrower.

31. By way of these actions, Aperture is interfering with Convergent's rights to receive the benefit of the Intercreditor Agreement, *i.e.*, service the Loan Agreement and recover amounts owed to Convergent by the Borrower.

32. In or around September 27, 2023, the Aperture Loan Amount was fully paid off and rights previously held by Aperture under the Loan Agreement should have automatically transferred to Convergent. Accordingly, all conditions precedent to the automatic assignment of Aperture's rights to Convergent have occurred.

33. As a result of Aperture's actions, Aperture has unfairly interfered with Convergent's right to receive the benefits under the Intercreditor Agreement and Loan Agreement. These breaches have prevented Convergent from receiving payments under the Loan Agreement occurring after September 27, 2023, the date Aperture was paid in full. These breaches have resulted in Convergent sustaining monetary damages in excess of $128,034.

## SECOND CLAIM FOR RELIEF

### (Breach of Contract)

34. Convergent reincorporates by reference the allegations contained in paragraphs 1 through 33 above as though fully set forth herein.

35. A valid contract exists between Convergent and Aperture, as evidenced by the Intercreditor Agreement.

36. Aperture has materially breached the terms of the Intercreditor Agreement by (a) failing to remit payments exceeding $128,034 to Convergent that were improperly received by Aperture after the Aperture Loan Amount had been satisfied, (b) continuing to assert rights under the Loan Agreement, when all remaining interest, with the exception of Aperture's retained rights, should have automatically transferred to Convergent, and (c) failing to timely provide a breakdown of the purchase price calculations in response to Convergent's Buy Out Notice.

37. Convergent sustained damages resulting from Aperture's breaches of the Intercreditor Agreement in an amount exceeding $128,034.

## PRAYER FOR RELIEF

WHEREFORE, Convergent prays for judgment as follows:

1. Judgment be entered in favor of Convergent and against Aperture with respect to all causes of action in the Complaint;
2. That the Court awards Convergent monetary damages in an amount to be proven at trial;
3. That the Court awards Convergent for all costs and interests; and
4. That the Court award such other relief as it may deem just and proper.

Dated: January 5, 2024        **BARNES & THORNBURG LLP**

By: /s/ Joseph M. Wahl
Joseph Wahl
Shant N. Nashalian
Attorneys for Plaintiff CONVERGENT MEDIA IV LLC